**FIRST STATE BANK OF ST. CHARLES, MISSOURI,**
Respondent,

v.

**Irwin James Frankel and Karen FRANKEL, Appellants.**

**No. ED 79669.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Oct. 1, 2002.

Gerald Phillip Greiman, Spencer Fane Britt & Browne, LLP, Clayton, MO, for Appellant.

James T. Barry Jr., Gregory Francis Herkert, Barry Law Firm, Clayton, MO, for Respondent.

SHERRI B. SULLIVAN, J.

*Introduction*

Irwin James Frankel (Frankel) and Karen Frankel (collectively the Frankels) appeal from a trial court judgment entered after a jury trial against the Frankels and in favor of First State Bank of St. Charles, Missouri (the Bank) in the amount of $303,058 for damages and attorney's fees for breach of a guaranty agreement. We affirm.

*Factual and Procedural Background*

Construction Network, Inc. (CNI), a defendant below, is a defunct construction company. At all pertinent times, Jeff T. McNeal (McNeal), also a defendant below, owned and operated CNI. Frankel and McNeal were acquaintances. The Bank was a client of Frankel's law firm. Around the fall of 1997, CNI began a project known as "the Enclave," an eight-unit residential development for senior citizens.

The project consisted of four buildings with two units in each building.

The estimated cost to construct the Enclave was $576,000. McNeal had purchased the Enclave property previously, utilizing a Bank loan. The Bank agreed to loan CNI $480,000, or 80% of the estimated construction cost. The eight units were to be built sequentially, with the units sold as they were completed and the profits from the earlier units funding the remaining 20% of the estimated construction cost.

Frankel was approached about providing a Bank loan guaranty for the Enclave. Frankel had provided Bank loan guaranties for two smaller CNI projects a couple of years earlier. Robert Niedergerke (Niedergerke) handled the Enclave transaction on behalf of the Bank, as he had the two previous Frankel Bank loan guaranties for CNI.

The Frankels executed and delivered a guaranty (the Frankel Guaranty) to the Bank on October 3, 1997. The $480,000 loan was reflected in a promissory note dated October 3, 1997, which indicated the purpose of the loan as "business: construction loan." The note was secured by a "future advance d/t dated 10/3/97 and personal guaranty dated 10/3/97." The Deed of Trust securing the note identified the Enclave property.

From the $480,000 loan, the Bank applied about $53,269 to pay off a previous CNI Bank loan, of which about $22,000 was unrelated to the Enclave. Also, $4,907 of the $480,000 was applied to loan origination and miscellaneous fees. The Bank transferred the remaining $421,824 to an escrow account with Davis Title Company for disbursement to CNI.[1]

1. At trial, the parties stipulated that about $11,709 was paid out of the Davis Title Company escrow account for satisfaction of a non-Bank loan dated prior to October 3, 1997 that was used to pay part of the land costs of the Enclave property.

CNI experienced cost overruns during the construction of the Enclave. On January 15, 1998, the Bank extended a $50,000 loan to CNI, which was reflected in a promissory note with the purpose of the loan indicated as "business: working capital." The note was secured[2] by a "future advance deed of trust dated 1/15/98 and personal guaranty dated 12/13/94 executed by Jeff T. McNeal and Teri L. McNeal."[3] The Deed of Trust securing the note identified the Enclave property. Niedergerke testified that the primary purpose of the loan was for cost overruns on the Enclave as well as other operating expenses for CNI.

On March 31, 1998, the Bank extended a $105,025 loan to CNI, which was reflected in a promissory note with the purpose of the loan indicated as "business: working capital." The note did not indicate any security. Niedergerke testified that the primary purpose of the loan was for expenses towards the Enclave cost overruns as well as operating expenses for CNI.

On June 30, 1998, the Bank extended a $160,000 loan to CNI, which was reflected in a promissory note with the purpose of the loan indicated as "business: business." The note was secured by "future advance dot dated 10-3-97, per gty by Jeff & Teri McNeal dated 12-13-94." Niedergerke testified that this loan was used primarily for the Enclave overdrafts and business expenses.

McNeal testified[4] that in addition to constructing the Enclave, some of the loan proceeds were used to keep CNI going, which McNeal told Niedergerke. The Enclave, although the biggest CNI project, was not the only CNI project at the time. However, McNeal did not know how much of any of the four loans went into any of the other projects besides the Enclave. Had the money not been available, CNI would have gone out of business and construction on the Enclave would have ceased. Niedergerke also did not know how much of any of the four loans went towards construction of the Enclave.

At McNeal's direction, Zara Stone, a CNI accounting employee, with the assistance of Diann Sherman, a CNI clerical employee, prepared a report, using checkbook ledgers, monthly checking account statements and cancelled checks, invoices, and payroll time sheets, summarizing the cost of the Enclave from the last quarter of 1997 through December 1998, although the project was not completed. The report broke down the cost into material, payroll, and overhead categories. The report indicated the following cost amounts: materials $433,000; payroll $102,393; overhead $124,561; total $659,597.[5] The report was prepared for the Bank, not for litigation, and the Bank relied on the re-

2. Within the security box on the note, the following language appears: This section is for your internal use. Failure to list a separate security document does not mean the agreement will not secure this note.

3. Teri L. McNeal is McNeal's wife. The McNeals executed and delivered to the Bank an unconditional guaranty on December 13, 1994.

4. McNeal did not testify at trial. Portions of his deposition testimony were read into the record at trial.

5. This amount included about $64,000 in outstanding bills for construction of the Enclave. At the time of his deposition, October 2000, McNeal testified that about $60,000 in bills for construction of the Enclave remained outstanding. Also, an expert who testified on behalf of the Frankels disagreed with the total cost of the Enclave construction as presented in the report and concluded that the total cost was closer to $506,000.

port to determine how much of the loans went into the Enclave.

Niedergerke testified that he would not have extended any of the four loans, totaling $795,025, on behalf of the Bank to CNI without the Frankel Guaranty. CNI did not meet the Bank's standard of credit worthiness based upon CNI's own assets and income. The Bank did not notify Frankel that it was extending the latter three loans to CNI. In August 1998, the Bank declined to advance any additional funds to CNI. McNeal approached Frankel to ask for more money and Frankel told McNeal that he needed to deal with the Bank.

Units one and two of the Enclave sold in April 1998 for a total of $158,000. Units three, four, five and six sold in November 1998 for a total of $339,500. Unit seven sold in April 1999 for $93,000. In December 2000, the Bank foreclosed on unit eight, and it received $40,100 in foreclosure proceeds.[6] Thus, the sale/foreclosure· proceeds from all eight Enclave units totaled $630,600.

At some point during the sales of the units and the application of the proceeds, Matthew Johannesman (Johannesman) replaced Niedergerke. From the sale proceeds of unit one, $57,319 [7] was applied to the October 3, 1997 Note, $16,690 was distributed to CNI's checking account,[8] and $4,991 was distributed to third parties.[9] From the sale proceeds of unit two, $50,319 was applied to the October 3, 1997 Note, $23,155 was distributed to CNI's checking account, and $5,526 was distributed to third parties.

From the sale proceeds of unit three, $71,471 was applied to the October 3, 1997 Note and $5,571 was distributed to third parties. The disposition of $42 remained unclear. From the sale proceeds of unit four, $84,748 was applied to the October 3, 1997 Note and $6,252 was distributed to third parties.

From the sale proceeds of units five and six, $155,025 was applied to pay off in full the January 15, 1998 Note and the March 31, 1998 Note. Johannesman testified that he applied the proceeds to these notes to consolidate the number of notes the Bank had in its relationship with CNI. Also from these proceeds, $11,374 was distributed to third parties and the disposition of $5,101 remained unclear.

From the sale proceeds of unit seven, $14,034 was distributed to CNI's checking account and $6,466 was disbursed to third parties. The closing statement indicated that $72,500 was retained in an escrow account with $62,500 to be used to finish the unit.

Although originally applying the $40,100 foreclosure proceeds from unit eight to the October 3, 1997 Note, the Bank ultimately credited CNI with the proceeds to pay down its Bank debt. Johannesman testified that because unit eight was not included in the CNI report summarizing the cost of the Enclave on which the Bank relied to determine the outstanding amounts under all four promissory notes that it would seek from the Frankels, the Bank decided not to credit the Frankels with the foreclosure proceeds.

On September 16, 1999, the Bank filed a petition against CNI, the Frankels, and

6. Unit eight was foreclosed on as an incomplete unit.

7. This amount included $7,319 in interest.

8. Johannesman did not know if CNI applied the funds to the Enclave.

9. For example, real estate agent commissions and closing costs.

the McNeals[10] seeking to recover the outstanding amounts under all four promissory notes and the guaranty agreements. The Frankels filed an answer, as well as counterclaims and affirmative defenses. On December 28, 2000, the trial court entered a default judgment against CNI and McNeal and in favor of the Bank.

At trial, the Bank claimed $256,988 in outstanding principal and interest under the October 3, 1997 Note.[11] That amount reflected Bank credits of $22,000 and $4,801 for previous applications to CNI indebtedness unrelated to the Enclave and interest on those principal credits. Under the January 15, 1998 Note, the Bank claimed $4,181 in interest only. Under the March 31, 1998 Note, the Bank claimed $7,519 in interest only. Under the June 30, 1998 Note, the Bank claimed $200,040 in outstanding principal and interest.[12] Thus, under all four promissory notes, the Bank claimed a total of $468,728 in outstanding principal and interest. However, relying on the CNI report summarizing the cost of the Enclave, the Bank utilized a percentage to determine a total of $319,065 in outstanding principal and interest under all four promissory notes related to the cost of the Enclave, and thus were guaranteed by the Frankel Guaranty.

In January 2001, after a four-day trial, the jury returned a verdict against the Frankels and in favor of the Bank in the amount of $185,058 on the October 3, 1997 Note. The jury found in favor of the Frankels on the January 15, March 31, and June 30, 1998 Notes. During trial, the Frankels filed motions for directed verdict at the close of the Bank's evidence and at the close of all the evidence, which the trial court denied.

Subsequently, the Bank filed a motion for award of attorney's fees seeking $118,950. The Frankels filed a memorandum of law in response to the Bank's motion. The trial court held an evidentiary hearing on the motion. At the start of the hearing, the Frankels requested the trial court to make written findings on certain issues and filed a Specification of Controverted Fact Issues on Which Findings are Requested. The trial court denied the Frankels' request for findings and granted the Bank's motion.

On January 30, 2001, the trial court entered a judgment in accordance with the jury verdict in the amount of $185,058 in damages and an additional $118,000 for reasonable attorney's fees. Subsequently, the Frankels filed a Motion for Judgment Notwithstanding the Verdict or, alternatively, to Amend the Judgment, for Remittitur or a New Trial. The Bank filed a Motion for New Trial. The trial court denied both motions. The Frankels appeal the trial court judgment. The Bank also appealed the judgment, but subsequently it filed a voluntary dismissal of its appeal.

### Discussion

The Frankels raise six points on appeal. In their first point, the Frankels argue that the trial court erred in denying their motions for directed verdict, judgment notwithstanding the verdict, and/or remittitur with respect to the Bank's claim on the October 3, 1997 Note. The Frankels argue that the proceeds the Bank garnered from

10. Although McNeal's wife was joined as a defendant below, she was never served with process, and the trial court subsequently dismissed without prejudice that portion of the Bank's petition directed against her only.

11. The Bank claimed $196,471 in principal and $60,517 in interest.

12. The Bank claimed $160,000 in principal and $40,040 in interest.

the sale/foreclosure of the Enclave units were required to be applied first to the October 3, 1997 Note rather than to other debts that CNI may have owed the Bank and that the proceeds were more than sufficient to satisfy the note and thus to discharge the Frankel Guaranty.

The standard of review of a denial of a judgment notwithstanding the verdict is essentially the same as for review of a denial of a motion for directed verdict. *Giddens v. Kansas City Southern Ry. Co.*, 29 S.W.3d 813, 818 (Mo. banc 2000). The question is whether the plaintiff made a submissible case. *Coggins v. Laclede Gas Co.*, 37 S.W.3d 335, 338 (Mo.App. E.D. 2000). To make a submissible case, a plaintiff must present substantial evidence for every fact essential to liability. *Id.* Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide a case. *Id.*

We view the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the plaintiff. *Id.* at 339. We presume that the plaintiff's evidence is true. *Id.* We disregard any of the defendant's evidence that does not support the plaintiff's case. *Id.* However, we do not supply missing evidence or give the plaintiff the benefit of unreasonable, speculative ·or forced inferences. *Id.* Whether the evidence in a case is substantial and whether the inferences drawn from the evidence are reasonable are questions of law. *Id.*

If the plaintiff fails to make a submissible case, then entry of judgment notwithstanding the verdict for the defendant is proper. *Reis v. Peabody Coal Co.*, 997 S.W.2d 49, 59 (Mo.App. E.D.1999). Granting a judgment notwithstanding the verdict is a drastic action that should be done only when reasonable persons could not differ on a correct disposition of the case. *Coggins*, 37 S.W.3d at 339. We will not overturn a jury verdict unless there is a complete absence of probative facts to support it. *Id.* Where reasonable minds can differ on the question before the jury, a court may not disturb the jury's verdict. *Id.* The jury determines the credibility of the witnesses. *Giddens*, 29 S.W.3d at 819.

To recover on a contract of guaranty, the creditor must show (1) that the defendant executed the guaranty; (2) that the defendant unconditionally delivered the guaranty to the creditor; (3) that the creditor, in reliance on the guaranty, thereafter extended credit to the debtor; and (4) that there is currently due and owing some sum of money from the debtor to the creditor that the guaranty purports to cover. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. banc 1993).

The Frankels' point one on appeal essentially argues that the Bank did not make a submissible case as to element four of the Bank's claim on the October 3, 1997 Note. The Frankels maintain that the Frankel Guaranty must be construed as embodying an agreement by the Bank to apply the Enclave sale/foreclosure proceeds first to the October 3, 1997 Note. Consequently, no money would be due under the October 3, 1997 Note and the Frankel Guaranty would be discharged.

Viewing the evidence and reasonable inferences in the light most favorable to the Bank and disregarding contrary evidence, the record reveals the following as it relates to this claim. The Frankel Guaranty provides that the Bank could "make loans or extend other accommodations to or for the account of" CNI. Frankel added the following handwritten notation to this clause: "(limited to construction of an 8 unit elder community)." The Frankel

Guaranty further provides that the Frankels guaranteed to the Bank:

> the payment and performance of each and every debt, liability and obligation of every type and description which [CNI] may now or at any time hereafter owe to [the Bank] (whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several, or joint and several; all such debts, liabilities and obligations being hereafter referred to as the 'Indebtedness'). Without limitation, this guaranty includes the following described debt(s): FSB Note # 22859 Dated 10/3/97.

Frankel added another handwritten notation following this clause: "(limited to loans for construction of an 8 unit elder community.)" The Frankel Guaranty also provides that the liability of the Frankels is an unlimited principal amount and that the guaranty is unsecured.

Paragraph 6 of the Frankel Guaranty provides in relevant part:

> Whether or not any existing relationship between the [Frankels] and [CNI] has been changed or ended and whether or not this guaranty has been revoked, [the Bank] may, but shall not be obligated to, enter into transactions resulting in the creation or continuance of Indebtedness, without any consent or approval by the [Frankels] and without any notice to the [Frankels]. The liability of the [Frankels] shall not be affected or impaired by any of the following acts or things (which [the Bank] is expressly authorized to do ... without notice to or approval by the [Frankels]): ... (ix) any order of application of any payments or credits upon Indebtedness; ....

We do not find that the Frankel Guaranty embodied an agreement by the Bank to apply the Enclave sale/foreclosure proceeds first to the October 3, 1997 Note. If Frankel thought such an agreement existed based on his conversations with Niedergerke, Frankel should have written the agreement into the Frankel Guaranty, as he wrote in his other limitations.

Further, McNeal testified that he did not provide the Bank with permission to apply the Enclave proceeds to anything other than the October 3, 1997 Note. However, the record does not indicate that McNeal actually directed the Bank to apply the proceeds first to the October 3, 1997 Note. If a debtor fails to specify the account to which a payment will be applied, the creditor may make the application. *Herrman v. Daffin,* 302 S.W.2d 313, 315 (Mo.App.1957). Niedergerke and Frankel testified that the eight Enclave units were to be built sequentially, with the units sold as they were completed and the profits from the earlier units funding the remaining 20% of the estimated project cost. Niedergerke testified that he never promised Frankel that when all the units were sold that all of the proceeds would be applied toward the October 3, 1997 Note.

The Frankels argue that Niedergerke's application of the sale proceeds from the first four units to the October 3, 1997 Note indicates an agreement between the Bank and the Frankels. However, at the time the Bank garnered the proceeds from the first two units in April 1998, the March 31, 1998 Note was not yet due and the June 30, 1998 Note was not yet executed. The Frankels also cite to testimony by Johannesman stating that if the Frankel Guaranty was limited to the October 3, 1997 Note, then he probably would have applied the proceeds to the $480,000. However, this testimony is inconclusive as to any

agreement between the Bank and the Frankels regarding application of the proceeds.

■ In the alternative, the Frankels argue that the Enclave sale/foreclosure proceeds were the "fruits of the transaction" enabled by the Frankel Guaranty, and thus the proceeds were required to be applied to the October 3, 1997 Note. The Frankels maintain that the "source of funds" rule applies. The "source of funds" rule states that when the creditor knows or is chargeable with knowledge of the source of the funds constituting payments, the creditor is obligated to apply the payment so as to protect the rights of the party supplying the funds. *Anchor Lumber Co. v. United Exteriors, Inc.*, 604 S.W.2d 754, 757 (Mo.App. E.D.1980). However, the verdict directors submitted for each of the four promissory notes required a verdict in favor of the Bank only if the following four conditions applied: the Frankel Guaranty applied to the note, the Bank relied on the Frankel Guaranty in making the loan under the note, the amount loaned under the note had not been fully repaid, and the Bank was thereby damaged. Thus, the jury could have returned their verdicts in favor of the Frankels on the latter three notes for the lack of any one or more of these conditions.

Accordingly, we do not find a complete absence of probative facts necessary to overturn the jury verdict. We find that the Bank presented substantial evidence for every fact essential to liability under its breach of a guaranty agreement claim, and thus it made a submissible case.

■ The Frankels also argue that the trial court erred in denying their motion for remittitur with respect to the Bank's claim on the October 3, 1997 Note. The trial court has broad discretion in ordering remittitur, and we will disturb its

decision only when the verdict is so excessive that it shocks the conscience and convinces this Court that both the trial court and the jury have abused their discretion. *Emery v. Wal–Mart Stores, Inc.*, 976 S.W.2d 439, 448 (Mo. banc 1998). In reviewing whether a verdict is excessive we are limited to a consideration of the evidence that supports the verdict excluding that which disaffirms it. *Smith v. Wal–Mart Stores, Inc.*, 967 S.W.2d 198, 208 (Mo.App. E.D.1998). There is no precise formula for determining whether a verdict is excessive, and each case must be considered on its own facts with the ultimate test being what fairly and reasonably compensates the plaintiff for the injuries sustained. *Id.* at 208–209. The assessment of damages is primarily the function of the jury. *Id.* at 208.

■ The Bank presented evidence that the Frankels owed a total of $319,065 on the four promissory notes, including $256,988 on the October 3, 1997 Note. The jury returned a verdict in the amount of $185,058 on the October 3, 1997 Note. Based on this evidence, we find that the trial court did not abuse its discretion in denying the Frankel's motion for remittitur with respect to the Bank's claim on the October 3, 1997 Note.

Accordingly, the Frankels' point one on appeal is denied.

In their second point on appeal, the Frankels argue that the trial court erred in denying their motion for remittitur or a new trial in light of the Banks' failure to ultimately credit the October 3, 1997 Note with the $40,100 foreclosure proceeds. The Frankels argue that they had a clear legal right to have the proceeds credited against the note because the Bank initially did so and thus it was legally barred from thereafter reversing that application to the Frankels' detriment and/or there was no

evidence that the CNI obligation against which the Bank ultimately credited the proceeds was secured by the underlying collateral.

■ Our review of a trial court's denial of a motion for remittitur is outlined above under the Frankels' point one on appeal. We review the trial court's denial of a motion for new trial for abuse of discretion. *M.E.S. v. Daughters of Charity Services of St. Louis,* 975 S.W.2d 477, 482 (Mo.App. E.D.1998). We must determine if there was substantial evidence to support the verdict. *Fierstein v. DePaul Health Center,* 24 S.W.3d 220, 225 (Mo. App. E.D.2000). We view the evidence in the light most favorable to the jury's verdict. *Id.* Matters such as the weight of the evidence, credibility of the witnesses, and resolution of conflicts in the testimony are not subject to our review. *Id.* We will not disturb the jury's verdict unless there is a complete absence of probative facts to support it. *Smith,* 967 S.W.2d at 208. In order for the trial court to grant a motion for new trial, the error complained of as a basis for the motion must be prejudicial to the party seeking the new trial. *M.E.S.,* 975 S.W.2d at 482–483.

Paragraph Nine of the Frankel Guaranty provides:

> If any payment applied by [the Bank] to Indebtedness is thereafter set aside, recovered, rescinded or required to be returned for any reason . . ., the Indebtedness to which such payment was applied shall for the purposes of this guaranty be deemed to have continued in existence, notwithstanding such application, and this guaranty shall be enforceable as to such Indebtedness as fully as if such application had never been made.

■ This paragraph applies if the Bank applied the $40,100 foreclosure proceeds to the October 3, 1997 Note and thereafter rescinded that application.

Even if the Bank did not credit the October 3, 1997 Note with the $40,100 foreclosure proceeds, we cannot determine that the jury did not do so in its verdict.

We find that the trial court did not abuse its discretion in denying the Frankel's motion for remittitur or for new trial with respect to the Bank's claim on the October 3, 1997 Note. Accordingly, the Frankels' point two on appeal is denied.

In their third point on appeal, the Frankels argue that the trial court erred in refusing to give the Frankels' proffered Instructions C and/or D regarding application of the proceeds the Bank garnered from the sale/foreclosure of the Enclave units.

Proffered Instruction C read as follows:

> Your verdict must be for the [Frankels] if you believe:

> First, the Frankel Guaranty only applied to the Note dated October 3, 1997, and

> Second, Bank was aware, or should have been aware, that because the Frankel Guaranty only applied to the Note dated October 3, 1997, Bank should have applied all payments or credits on CNI's debts to the Note dated October 3, 1997; and

> Third, that Bank did not apply to the Note dated October 3, 1997 all payments or credits on CNI debts; and

> Fourth, as a direct result of Bank's failure to apply all payments or credits to the Note dated October 3, 1997, the Frankels were damaged.

Proffered Instruction D read as follows:

> In determining whether any amounts are owed by the Frankels under their guaranty, you are instructed first to apply all payments or credits, if any, to the amount loaned, if any, under Note A

that was used in construction of the Enclave.

Both proffered Instructions C and D were non-Missouri Approved Instructions [MAI].

The Frankels argue that in refusing to give these instructions, the trial court precluded the jury from fully and fairly considering the Frankels' defenses to the Bank's claim on the October 3, 1997 Note because there was ample legal and factual basis for concluding that the proceeds the Bank garnered from the sale/foreclosure of the Enclave units were required to be applied first to the October 3, 1997 Note and that the proceeds were more than sufficient to satisfy the note and thus to discharge the Frankel Guaranty.

 Whether or not a jury was properly instructed is a question of law. *Hosto v. Union Elec. Co.*, 51 S.W.3d 133, 142 (Mo. App. E.D.2001). An instruction shall be given or refused by the trial court according to the law and the evidence in the case. Rule 70.02(a).[13] A non-MAI instruction must be simple, brief, impartial, free from argument, and not submit to the jury or require findings of detailed evidentiary facts. Rule 70.02(b).

 We review a trial court's refusal to submit an instruction for abuse of discretion. *Higby v. Wein*, 996 S.W.2d 95, 97 (Mo.App. E.D.1999). An instruction must be supported by substantial evidence. *Wuerz v. Huffaker*, 42 S.W.3d 652, 655 (Mo.App. E.D.2001). Substantial evidence is that evidence which, if true, is probative of the issues and from which the jury can decide the case. *Id.* When a party claims the trial court erred in refusing an instruction, we view the evidence and reasonable inferences therefrom in the light most favorable to the submission of the instruction and disregard contrary evidence. *Id.*

A party is entitled to an instruction on any theory supported by the evidence. *Higby*, 996 S.W.2d at 97. We will not reverse a verdict due to instructional error, including the refusal to give an instruction, unless the error was prejudicial. *Id.*

 We find that the submitted verdict directors sufficiently addressed the contents of Instruction C. The jury was presented evidence regarding the application of the sale/foreclosure proceeds. The verdict directors required the jury to determine what, if any, amounts were due under each of the four notes. Thus, the jury was free to apply the proceeds as it saw fit. We also find that Instruction D was not impartial. The instruction directed the jury to resolve a central issue in the case in a certain manner rather than allowing the jury to decide how to decide the issue.

Under the facts of this case, the trial court did not abuse its discretion in refusing to tender proffered Instructions C and D. Accordingly, the Frankels' point three on appeal is denied.

In their fourth point on appeal, the Frankels argue that the trial court erred in refusing to give the Frankels' proferred Instruction A, grounded in promissory estoppel.

Proffered Instruction A read as follows:

Your verdict must be for the [Frankels] if you believe:

First, Bank represented to the Frankels any one or more of the following:

a. Bank would strictly limit all advances to [CNI] from an Escrow Account established for the loan to be secured by the Frankel Guaranty such that the escrowed funds would be used only for construction of the Enclave; and/or

---

13. All rule references are to Mo. R. Civ. P.2002, unless otherwise indicated.

b. No existing loans were guaranteed by the Frankel Guaranty; and/or

c. The cost of the land for the Enclave was not guaranteed by the Frankel Guaranty; and/or

d. The Bank would not make new loans to CNI in addition to the $480,000 for the Enclave; and

Second, Bank should have reasonably expected the Frankels to rely on upon (sic) its representations;

Third, the Frankels relied on one or more of the above representations in agreeing to give the Frankel Guaranty; and

Fourth, Bank acted in one or more of the following ways:

a. Bank disbursed funds other than through the Escrow Account to CNI for uses other than construction of the Enclave; and/or

b. Bank paid existing loans from the Note dated October 3, 1997; and/or

c. Bank paid for land from the Note dated October 3, 1997; and/or

d. Extended loans to CNI in addition to the Note dated October 3, 1997

that Bank claims are guaranteed by the Frankel Guaranty; and/or

e. Extended new loans for the Enclave to CNI in addition to the Note dated October 3, 1997.

Proffered Instruction A was a non-MAI instruction.

The Frankels argue that in refusing to give Instruction A, the trial court precluded the jury from fully and fairly considering the Frankels' defenses to the Bank's claim on the October 3, 1997 Note because there was ample legal and factual basis for concluding that the Bank made and breached promises to the Frankels regarding the loan and the Frankel Guaranty.

■ We find that Instructions 8, 12, 16, and 20 sufficiently addressed the contents of Instruction A,[14] and therefore the Frankels were not prejudiced by the trial court's refusal to submit Instruction A. Under the facts of this case, the trial court did not abuse its discretion in refusing to tender proffered Instruction A. Accordingly, the Frankels' point four on appeal is denied.

In their fifth point on appeal, the Frankels argue that the trial court erred in

14. Instructions 8, 12, 16, and 20 were submitted for each of the four notes respectively and were otherwise identical as follows:

Your verdict must be for the [Frankels] if you believe:
First, Bank represented to the Frankels any one or more of the following:
a. Bank would strictly limit all advances to [CNI] from an Escrow Account established for the loan to be secured by the Frankel Guaranty such that the escrowed funds would be used only for construction of the Enclave; and/or
b. No existing loans were guaranteed by the Frankel Guaranty; and/or
c. The cost of the land for the Enclave was not guaranteed by the Frankel Guaranty; and/or

d. The Bank would not make new loans to CNI in addition to the $480,000 for the Enclave; and
Second, Bank intended that Frankels would rely upon one or more of the representations; and
Third, one or more of the representations were false; and
Fourth, Bank knew or should have known those representations were false at the time they were made; and
Fifth, the representations that were false were material to the Frankels agreeing to give the Frankel Guaranty; and
Sixth, the Frankels relied on one or more of the representations in agreeing to give the Frankel Guaranty, and in so relying the Frankels used that degree of care that would have been reasonable in the Frankels' situation.

refusing to give the Frankels' proferred Instruction B, grounded in the implied covenant of good faith and fair dealing.

Proffered Instruction B read as follows:

Your verdict must be for the [Frankels] if you believe:

First, either:

Bank knew, or should have known, in January 1998, CNI had experienced cost overruns on the Enclave, or

Bank knew, or should have known, that CNI was not able as of January 1998 to continue financially with construction of the Enclave without additional loans, and

Second, Bank failed to seasonably inform the Frankels that either:

By January 1998, CNI had experienced cost overruns on the Enclave, or

CNI was not able as of January 1998 to continue financially with construction of the Enclave without additional loans, and

Third, as a direct result of either:

CNI having experienced cost overruns on the Enclave by January 1998, or

CNI's inability to continue financially with construction of the Enclave without additional loans,

the Frankels' interests in the Frankel Guaranty were in jeopardy.

Proffered Instruction B was a non-MAI instruction.

The Frankels argue that in refusing to give Instruction B, the trial court precluded the jury from fully and fairly considering the Frankels' defenses to the Bank's claim on the October 3, 1997 Note because there was ample legal and factual basis for concluding that the Bank knew of CNI's cost overruns and need for additional loans

on the Enclave project and the Bank failed to inform the Frankels of the same, thereby jeopardizing the Frankels' interests.

 We find that there was insufficient evidence to support a submission to the jury of the Frankels' affirmative defense of the implied covenant of good faith and fair dealing. The Frankel Guaranty does not require the Bank to notify the Frankels of the information identified in Instruction B. Further, under the facts of this case, we do not find such a requirement under the implied covenant of good faith and fair dealing. The trial court did not abuse its discretion in refusing to tender proffered Instruction B. Accordingly, the Frankels' point five on appeal is denied.

In their sixth point on appeal, the Frankels argue that the trial court erred in awarding attorney's fees in the amount of $118,000 to the Bank because the award was lacking in legal and factual support in that (1) for the reasons set forth in the preceding points on appeal, the judgment for the Bank cannot stand and thus the Bank cannot be viewed as a prevailing party; (2) the Bank failed to meet its burden of establishing its fees claimed in sufficient detail to enable the trial court to assess the reasonableness of the fees claimed; and/or (3) the trial court erroneously refused to make detailed findings despite the Frankels' request, included fees for non-compensable matters, and awarded fees that were excessive and unreasonable.

 Missouri has adopted the "American Rule," which provides that litigants must bear the expense of their own attorney's fees. *Chapman v. Lavy*, 20 S.W.3d 610, 614 (Mo.App. E.D.2000). However, a trial court may award attorney's fees to a prevailing party if a con-

tract provides for the payment of attorney's fees and expenses incurred in the enforcement of a contract provision. *Brockman v. Soltysiak*, 49 S.W.3d 740, 745 (Mo.App. E.D.2001). The amount of attorney's fees awarded is within the sound discretion of the trial court. *Id.* Because trial courts are considered experts on attorney's fees, they require no evidence as to the value of the services. *Id.* An award of attorney's fees will be reversed only upon finding that the trial court abused its discretion. *Ruzicka v. Hart·Printing Co.*, 21 S.W.3d 67, 73 (Mo.App. E.D.2000). We will not reverse an award of attorney's fees unless the trial court has arbitrarily arrived at the award or the award is so unreasonable that it indicates indifference and lack of proper judicial consideration. *Distler v. Reuther Jeep Eagle*, 14 S.W.3d 179, 186 (Mo.App. E.D.2000).

The Frankel Guaranty provides that the Frankels "will pay or reimburse [the Bank] for all costs and expenses (including reasonable attorney's fees and legal expenses) incurred by [the Bank] in connection with the protection, defense or enforcement of this guaranty in any litigation...."

■ A prevailing party is the party prevailing on the main issue in dispute, even though not necessarily to the extent of its original contention. *Ken Cucchi Constr., Inc. v. O'Keefe*, 973 S.W.2d 520, 528 (Mo.App. E.D.1998). The Bank prevailed in its breach of a guaranty agreement claim against the Frankels and obtained a substantial damage award under one of the promissory notes under which it sought recovery. We find that the Bank was the prevailing party, and thus the Bank was entitled to attorney's fees under the Frankel Guaranty.

■ The Bank presented evidence of attorney's fees totaling $118,950. The evidence included an exhibit comprised of monthly invoices setting forth the services performed. One of the two Bank attorneys also testified to the hourly rates for the services performed. The attorney's fees have been paid, indicating reasonableness. *See Next Day Motor Freight, Inc. v. Hirst*, 950 S.W.2d 676, 680 (Mo.App. E.D. 1997). The trial court awarded the Bank $118,000 in attorney's fees. We do not find that the trial court arrived at this amount arbitrarily or that the award is so unreasonable that it indicates indifference and lack of proper judicial consideration.

The Frankels argue that the Bank's attorney's fees related to defending against the Frankels' counterclaims should not have been awarded. However, as quoted above, the language of the Frankel Guaranty provides for reimbursement of attorney's fees for "defense" of the guaranty.

■ The Frankels further argue that Rule 73.01(c) required the trial court to make detailed findings regarding the Bank's motion for award of attorney's fees at their request. We find that Rule 73.01(c) does not apply. Although the trial court heard the motion, the motion was part of a case that was tried to a jury, and Rule 73 applies to cases tried without a jury or with an advisory jury.

The trial court did not abuse its discretion in its award of attorney's fees to the Bank. Accordingly, the Frankels' point six on appeal is denied.

### Conclusion

The judgment of the trial court is affirmed. However, we remand the case to the trial court for a determination of the Bank's attorney's fees expended on the appeal.[15]

WILLIAM H. CRANDALL, JR., P.J., and GLENN A. NORTON, J., concur.

**15.** The Bank filed with this Court a Motion for Award of Attorney's Fees expended on the appeal.